# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **TRIP KLOSER** | ) | |
| 14113 Big Branch Drive | ) | |
| Dayton, MD 21036 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **THE KLOSER GROUP LLC** | ) | |
| 14113 Big Branch Drive | ) | |
| Dayton, MD 21036 | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 07-cv-2521 MJG |
| | ) | |
| **FIRE & ICE IMPORTS, LLC** | ) | |
| Kristin A. Proctor, Resident Agent | ) | |
| 528 3rd Street | ) | |
| Hermosa Beach, CA 90254 | ) | |
| | ) | |
| **ELITE WATER COMPANY** | ) | |
| Kristin A. Proctor, Resident Agent | ) | |
| 528 3rd Street | ) | |
| Hermosa Beach, CA 90254 | ) | |
| | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT AND** |
| | ) | **JURY DEMAND** |
| **ZACHARY PROCTOR** | ) | |
| 528 3rd Street | ) | |
| Hermosa Beach, CA 90254 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **KRISTIN A. PROCTOR** | ) | |
| 528 3rd Street | ) | |
| Hermosa Beach, CA 90254 | ) | |
| | ) | |
| Defendants | ) | |

Plaintiffs Trip Kloser ("Trip"), a Maryland citizen and resident, and The Kloser Group LLC ("Kloser Group"), a Maryland limited liability company (collectively, "Plaintiffs"), by and through their attorneys, Mudd Law Offices and Oppenheimer, Fleischer & Quiggle, P.C., sue defendants Fire & Ice Imports, LLC ("Fire & Ice"), a California limited liability Company; Elite Water Company ("Elite Water"), a California company; Zachary Proctor ("Zach"), a citizen and resident of Hermosa Beach, California; and Kristin Proctor ("Kristin"), a citizen and resident of Hermosa Beach, California, (collectively, "Defendants"); upon personal information as to their own activities and upon information and belief as to the activities of others and all other matters, and as and for their complaint state as follows:

## NATURE OF ACTION

1. This is an action for breach of contract, fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, defamation, and other related torts arising from the Defendants' malicious and wrongful efforts to deceptively acquire the benefit of Trip's experience, knowledge, trade insights and contacts in the alcoholic beverage industry.  In this action, Plaintiffs seek compensatory and punitive damages, and attorney's fees and costs.

## PARTIES

2. Trip is a Maryland citizen and resident residing at the address stated in the caption. Trip is Kloser Group's owner and sole member.

3. Kloser Group is a Maryland limited liability company with its principal place of

business at the address stated in the caption.

4.  Fire & Ice is a California limited liability company with its principal place of business at the address stated in the caption.

5.  Upon information and belief, Elite Water is a California company with its principal place of business at the address stated in the caption.

6.  Zach is a California citizen and resident who resides at the address stated in the caption.  Zach serves as President and Managing Member of Fire & Ice and President of Elite Water.

7.  Kristin is a California citizen and resident who resides at the address stated in the caption.  Kristin serves as General Counsel of Fire & Ice.  Kristin has ownership interest in Fire & Ice.  Upon information and belief, Kristin has ownership in or is entitled to ownership interest in Elite Water.

## JURISDICTION AND VENUE

8.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 on the basis of diversity jurisdiction.  The amount in controversy exceeds $75,000.

9.  The Court has supplemental jurisdiction over the subject matter of Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

10.  The Court may exercise personal jurisdiction over Fire & Ice because Fire & Ice transacted business within the State of Maryland and caused harm within the State of Maryland.

11.  The Court may exercise personal jurisdiction over Elite Water because Elite

Water transacted business within the State of Maryland and caused harm within the State of Maryland.

12.  The Court may exercise personal jurisdiction over Zach because Zach transacted business within the State of Maryland and caused harm within the State of Maryland.

13.  The Court may exercise personal jurisdiction over Kristin because Kristin transacted business within the State of Maryland and caused harm within the State of Maryland.

14.  The Proctors acted as Fire & Ice's agents as well as in and for their own personal interests.

15.  The Proctors acted as Elite Water's agents as well as in and for their own personal interests.

16.  Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this district.

17.  An actual case or controversy has arisen between the parties.  Defendants have breached a contract with Trip, have fraudulently made misrepresentations to Trip upon which he relied to his detriment, and have engaged in other wrongful conduct.  Plaintiffs have been injured by Defendants' conduct and have suffered damages resulting therefrom.

18.  Plaintiffs bring claims against the Proctors in both their individual and official capacities.

## FACTUAL BACKGROUND

### Plaintiffs' Professional Background

19.  Trip is an independent beer sales and marketing consultant.  For more than twenty-five years, Trip has worked in the beer industry with extensive supplier side experience.

20.  Most of Trip's business is conducted through Kloser Group.

21.  Trip has worked closely with beer wholesalers and distributors throughout the United States, including The Anheuser Busch Company and its wholesale and distribution network ("Anheuser Busch").

22.   He has developed substantial contacts in the beer industry that would be beneficial to any company doing business in the alcoholic beverage industry.

23.  He has further developed substantial trade insights beneficial to any company doing business in the alcoholic beverage industry.

### Defendants' Professional Background

24.  Prior to starting Elite Water, the Proctors had no experience in the beverage industry.

25.   Zach Proctor had been involved in corporate and creative endeavors with Hollywood studios.

26. Zach Proctor has stated that he wanted to leave the Hollywood business because of the industry's alleged unsavory business practices where agents and producers would make promises, use an individual's talents to obtain deals, and, just as the deals come to

fruition, cut the individual out of the deals.

27.  Kristin Proctor has been described as an "expert in tax and corporate law," well-versed in United States state and federal import regulations, and a freelance attorney with Chernove & Associates in Los Angeles, California.

## Origination of Parties' Relationship

28.  In or about the first part of 2006, Zach became interested in becoming involved with the beverage industry.

29.  Prior to this time, he had no experience in the beverage industry.

30.  After hearing of Trip, a consultant in the beverage industry, Zach contacted and began communicating with Trip in July 2006 about hiring Trip as a consultant to help Zach with his efforts in the beverage industry.

31.  In August 2006, Elite Water, a family business owned by the Proctors, hired Trip as a consultant to set up and secure an order through United Natural Foods, Inc. ("UNFI").

32.  Specifically, Zach executed a Management Consultant Proposal drafted by Kloser Group on August 4, 2006.

33.  The Management Consultant Proposal ("MCP") provided for a contract term of six months and a rate of $125 per hour.  If the consulting work required travel, the MCP provided for reimbursement of airfare expenses; $500.00 toward other daily travel expenses (hotel, car rental, meals, etc.); and a daily consulting fee of $1,000.00.

34.  Because Zach came as a referral from a family member, Trip agreed to reduce his consulting rate to $125 per hour.

35.   Elite Water had secured interest from Whole Foods Market to buy Vellamo Finnish Mineral Water.  However, Whole Foods Market wanted to buy the Vellamo through its preferred distributor, UNFI.

36.  Because Zach lacked the knowledge on how to set up and secure an order through UNFI, Elite Water hired Trip to do so.

37.   As a consultant for Elite Water, Trip set up and secured the order of Vellamo through UNFI for Whole Foods.  Additionally, Trip established the procedures and pricing for both Whole Foods Market and UNFI.

38.   Trip completed this initial work for which Elite Water hired him in mid-October.

39.  For this work through mid-October, Kloser Group billed Elite Water for expenses and consulting time.

40.   Elite Water paid Kloser Group's invoices in a timely manner.

41.  Both the MCP and the invoices from Kloser Group specifically identified Kloser Group's Maryland address.

42.   The Parties did not terminate the MCP, and Elite Water continued to utilize Trip's services beyond mid-October for purposes of keeping communications open with UNFI and Whole Foods.  This included placating any concerns arising from the constant delays in delivering Vellamo caused by problems with packaging, labeling, and the water tests imposed by the United States.

**Vellamo Commissions**

43.  In August, Elite Water requested that Trip serve as a broker to secure sales with

Whole Foods for which Trip would obtain a 5% commission on the gross sales amount of any orders he processed.

44.  Trip explained to Elite Water that he was not proficient brokering in the water business and recommended that Zach seek a professional from that specific field once he successfully processed his initial orders.

45.  Despite this, the Proctors wanted to have Trip temporarily serve as a broker under these terms.  Trip agreed.

46.  Trip completed a sale for Vellamo in August 2006.  He also completed a second order for Vellamo on December 20, 2006 for total sales of approximately $60,000.

47.  Based on his sales of Vellamo, Trip is entitled to approximately $3,000 in commissions for which he has not been paid.

### Fire & Ice Imports Emerges

48.  In October 2006, Zach approached Trip about importing additional products.

49.  Zach informed Trip that he had just entered the water business and, apart from this, had no prior experience in the beverage industry.

50.  Zach further explained that, due to his inexperience, he had no idea how to obtain rights to beers or spirits, let alone market and sell them.

51.  Zach informed Trip that he may have opportunities from other Scandinavian beverages, including a Swedish Vodka made by Cape North.

52.  Trip informed Zach that he may have an opportunity to import an exotic liquor from Austria (Sporer).

53.  With Trip's expertise and connections in the alcohol industry, Zach believed that together they had a chance at obtaining importation rights to the Austrian liquor, Swedish vodka, and other Scandinavian beverages.

54.  While the initial discussions between Zach and Trip relating to the importation of additional products involved doing so under Elite Water, the Parties eventually discussed creating a separate entity apart from Elite Water for this purpose.  The separate entity would exist to import other exotic beverages from around the world.

55.  Trip informed Zach that he would be interested in becoming an equity partner in an importing company, but that he would not be interested in working as a broker or working on commission.

56.  Trip suggested a 50/50 partnership.  Zach declined this suggestion.

57.  Zach informed Trip that he wanted to maintain control of any company and wanted to bring his wife, Kristin, who had a legal background, into the business.

58.  These discussions continued for a few months.

59.  Beginning on or around October 18, 2006 and while these discussions continued, Trip continued to invest time and effort on behalf of Elite Water with respect to the Vellamo product.  He did so as a gesture of good faith in light of the discussions regarding the creation of a separate entity in which he would own an equity interest.

60.  Although the MCP had not been terminated, Trip did not bill Elite Water because of the new partnership relationship developing between him and Zach.

61.  Since October 18, 2006, Trip has not been paid for his consulting time relating

to Elite Water and Vellamo.

62.  In and around October 2006, Trip suggested that Zach consider including the Vellamo product into the new entity.

63.  Trip offered to "buy in" on the initial order of Vellamo at 50%.  Zach declined this generous offer.

64.  All efforts relating to Vellamo remained separate from the potential new entity being discussed.

**Agreement as to Fire & Ice Structure**

65.  Eventually, in December 2006, Zach and Trip agreed to create a new venture in the form of a new Limited Liability Company.

66.  The new company would be named "Fire & Ice Imports, LLC."  Zach chose this name.

67.  Trip designed the business card and company letterhead for Fire & Ice, including the company logo, font and color.

68.  From this point forward, Zach represented to third parties that Trip and he were partners and that Trip held an equity interest in Fire & Ice.

69.  In December 2006, Trip learned of a potential distributorship relationship with a third party, HISweets, for an iced coffee product.

70.  Trip made initial contact with HISweets and developed the potential opportunity.

71.  Trip forwarded this potential opportunity to Zach.

72.  Zach responded by proposing several cumbersome partnership arrangements

between the Proctors and Trip.

73.  In December 2006, Niklas Davidsson, the President of Cape North Vodka, intended to be in Los Angeles.  He agreed to meet with Zach and Trip to discuss the possibility of Fire & Ice importing and representing Cape North Vodka in the United States. Zach and Trip met with Niklas Davidsson in Los Angeles.

74.  Based on the positive meeting with Cape North Vodka and the opportunities that had been presented, Zach and Trip agreed that the Proctors would own a 60% equity interest in Fire & Ice and Trip would own a 40% equity interest in Fire & Ice.

75.  Fire & Ice would involve products such as the iced coffee product opportunity Trip had developed and other exotic alcoholic and non-alcoholic beverages.

76.  Additionally, they agreed to certain defined duties and responsibilities for each of the members.

77.  The Proctors sent Trip a Limited Liability Company Nonresident Members' Consent form to complete for purposes of identifying Trip as a nonresident (outside California) member of Fire & Ice.

78.  Trip signed the Nonresident Members' Consent form on February 18, 2007.

79.  Toward the end of April 2007, the Proctors sent Trip a proposed LLC Operating Agreement.

80.  Initially, the LLC Operating Agreement provided for a total capital investment of $50,000.

81.  Trip signed the LLC Operating Agreement and returned it to the Proctors.

82. Later, the Parties agreed to reduce the total capital investment in half to $25,000.

### The First Product

83. The iced coffee opportunity from HISweets continued to develop under the product name Konaccino.

84. With respect to Konaccino, Trip completed extensive market research so that he could negotiate favorable pricing from the potential suppliers.

85. With respect to Konaccino, Trip negotiated favorable pricing from HISweets to maximize profit opportunity for Fire & Ice.

86. Trip also developed the packaging, font, color layout, and most of the verbiage for the new Konaccino label.

87. In April, Trip invested $2,340.00 as part of his investment contribution. This amount reflected 40% of the down payment needed to execute the Konaccino purchase order of $19,800.

88. In late May, Trip invested an additional $7,660.00 to complete his total investment of $10,000 (40% of $25,000) in Fire & Ice.

### Fire & Ice Scandinavian Efforts

89. In February and March 2007, on behalf of Fire & Ice, Trip and Zach traveled to Scandinavia to secure exclusive importing rights for various Scandinavian alcoholic and non-alcoholic beverage products.

90. Prior to this Scandinavian business trip, Trip completed extensive market research so that he could negotiate favorable pricing from the potential suppliers to ensure

that (a) there would be sufficient interest, (b) the products would be competitively priced in the United States market, and (c) Fire & Ice would have sufficient margins to support marketing and sales efforts.

91. During the Scandinavian trip, Trip and Zach successfully obtained conditional contracts for Finnish Nord water and Finnish Nordic Koivu (Birch sap drink).

92. The "conditional" nature of the contracts provided Fire & Ice an unspecified amount of time in which it would be the exclusive importer in the United States.

93. During the Scandinavian Trip, Trip and Zach met with Cape North Vodka.

94. As a result of the meeting with Cape North Vodka, Trip and Zach successfully obtained a four-year exclusive contract with Cape North Vodka where Fire & Ice would be the importer, sales and marketing agents for Cape North Vodka in the North American continent and the Caribbean.

95. During the presentations to Cape North Vodka, Zach and Trip presented themselves as equity partners with Zach handling logistics and Trip handling sales, marketing, business development and pricing.

96. Cape North Vodka understood Zach and Trip to be equity partners and would not have entered the agreement with Fire & Ice otherwise.

97. Trip successfully negotiated favorable supplier pricing from Cape North Vodka.

98. Both Zach and Trip considered the Scandinavian trip to be a successful venture.

99.   After returning from Europe, Trip immediately set out to establish a pricing schedule and initial marketing materials for Nord Ice Age Water, Cape North Vodka, and Nordic Koivu.

100.  In addition, he did the same for Konaccino.

101.  Further, Trip's responsibilities included presenting the products for purposes of developing customers and securing purchase orders.

102.   Zach's responsibilities included applying for all licenses, meeting all government requirements, handling freight and import duties, obtaining label approvals, and arranging shipping and customs brokers for all of the products.

**Domestic Issues and Hurdles**

103.   The United States imposes particular requirements on importers prior to allowing foreign beverage products for sale in the United States market.

104.  With respect to the products being considered by Fire & Ice, none of them had ever been sold in the United States.

105.  Because none of the products being considered by Fire & Ice had been sold in the United States, all of the prospective customers wanted to be sure that the products would meet the requirements imposed by the United States Government and the state governments. Specifically, the prospective customers wanted to be sure that the products would be legal, contain proper labeling, have proper licensing, and be approved for sale in the United States.

106.  Prospective customers would not execute purchase orders unless the foregoing requirements had been met.

107.  Additionally, although Trip secured very strong interest in many of the products being considered by Fire & Ice, the prospective customers would not execute purchase orders until a "live" sample of the actual product to be sold in the United States could be presented to them.

108.  Some potential customers also requested proof of sufficient product liability insurance that Zach had not yet obtained.

109.  Zach had obtained ill-informed advice from a third party to delay purchasing liability insurance.  Once he learned of the costs involved, Zach chose not to purchase liability insurance.

110.  In addition to delays in product testing and labeling, the absence of liability insurance hindered Trip's efforts to obtain purchase orders for the products.

111.  Trip had successfully obtained substantial interest in the products being considered by Fire & Ice.  However, Zach's failure to obtain the necessary components to facilitate import into the United States and an actual live product hindered Trip's ability to transform vendor interests into completed sales.

112.  In addition, proper labeling, testing and licensing for new, imported beverage products (particularly alcoholic beverage products) take a considerable amount of time.

113.  In fact, Fire & Ice only obtained the proper labeling, testing, and licensing for some of the products toward the end of May 2007.

114.  Additionally, all of the labeling issues for the Cape North product only became resolved in the first week of June.

115.  And, for some products such as Koivu, Zach failed to obtain the proper labeling altogether.

116.  As such, until the end of May and first week in June, the bureaucratic requirements significantly hindered Trip's efforts to sell the products.

117.  Despite these problems, Trip successfully moved forward in efforts to sell products.

### Trip's Efforts

118.  Trip expended significant time, effort and resources in both meeting and exceeding his responsibilities under the agreement with the Proctors.

119.  As an example of Trip's efforts, he developed strong interest in Konaccino; created the label for the product (including most of the verbiage, fonts, colors, and feel of the package); produced the sales and marketing materials for the product; and, negotiated favorable supplier pricing for the product.

120.  As an example of Trip's efforts, he developed strong interest in Finnish Nord water; provided suggestions relating to the product's packaging and labeling that included case layout, pallet configuration; label layout, and verbiage; developed the pricing and marketing strategy for the United States market; and secured a purchase order within three (3) weeks of returning from Finland despite the delays in meeting United States requirements.

121.  As an example of Trip's efforts, he developed all pricing, sales and marketing materials for Koivu as well was provided packaging and labeling instructions.

122.   Additionally, Trip fulfilled 100% of the sales and marketing obligations provided for within the agreement between Cape North and Fire & Ice.

123.   Trip provided 100% of the market knowledge for Cape North in terms of pricing, business development, marketing and sales opportunities.

124.   Trip developed the pricing strategies for the United States market and pricing and marketing strategies for partnership potential with Anheuser-Busch.

125.   Through contacts developed over several years, Trip obtained an exclusive meeting for Cape North Vodka with Anheuser Busch that took place on May 16, 2007 ("May AB Meeting").

126.   Additionally, Trip requested and secured a meeting to present Cape North to the largest Anheuser Busch wholesaler in the United States, Ben E. Keith, with whom he had a long-standing relationship.   The meeting was scheduled for June 8, 2007.

127.   Trip provided Glife, Cape North's affiliate social network website, with unique and proprietary relationships within Anheuser Busch, Inc. and its affiliate, Busch Media, that led to a business agreement between Glife and Busch Media in the UK and Sweden.

128.   Trip created and suggested the marketing tool for Glife "Image Delivery System."

129.   Additionally, Trip assisted Zach and Kristin in their duties and obligations under the LLC Agreement.

130.   Additionally, all of Fire & Ice sales, pricing, logistics, customers, and market relations are directly attributable to Trip.

131.  Each month, Trip invested a substantial amount of time, effort, and expenses on behalf of Fire & Ice to ensure that it would become a successful company.  This time and effort involved communications with the Proctors, communications with third parties, research, sales and business development, continuing market research, and logistic support.

132.  With respect to Elite Water, Trip developed all pricing, sales and marketing materials for Vellamo.

133.  For October 2006, Trip expended approximately 32 hours on behalf of Fire & Ice and Elite Water.

134.  For November 2006, Trip expended approximately 75 hours on behalf of Fire & Ice and Elite Water.

135.  For December 2006, Trip expended approximately 70 hours on behalf of Fire & Ice and Elite Water.

136.  In December 2006, Trip traveled to Los Angeles on behalf of Fire & Ice business for three days relating to the Cape North products.

137.  For January 2007, Trip expended approximately 155 hours on behalf of Fire & Ice and Elite Water.

138.  For February 2007, Trip expended approximately 115 hours on behalf of Fire & Ice and Elite Water.

139.  From February 23, 2007 through March 3, Trip traveled to Finland and Sweden on behalf of Fire & Ice and Elite Water.

-18-

140.  For March 2007, Trip expended approximately 155 hours on behalf of Fire & Ice and Elite Water.

141.  For April 2007, Trip expended approximately 145 hours on behalf of Fire & Ice and Elite Water.

142.  For May 2007, Trip expended approximately 155 hours on behalf of Fire & Ice and Elite Water.

143.  In May 2007, Trip traveled to St. Louis, Missouri for two days on behalf of Fire & Ice with respect to Cape North products.

144.  For June 2007, Trip expended approximately 35 hours on behalf of Fire & Ice and Elite Water.

145.  In June, Trip traveled to Texas for one day.

146.  In sum, Trip expended a substantial amount of time on behalf of Fire & Ice and Elite Water over several months.

**Termination of Equity**

147.  Prior to June 3, 2007, relations between Trip and the Proctors appeared to be satisfactory.

148.  Prior to June 3, 2007, Fire & Ice had successfully benefited from Trip's experience, knowledge, and talents.

149.  Fire & Ice had obtained a coveted contract from Cape North Vodka and had successfully introduced Cape North Vodka to Anheuser-Busch.  The Cape North-Anheuser Busch relationship continued to develop and looked very favorable.

150.   Additionally, labeling and other technical issues were being resolved.   This provided for the opportunity to secure purchase orders for the various products.

151.   As of June 3, 2007, Fire & Ice was a successful, growing import business.

152.   On Sunday, June 3, 2007, Zach sent Trip an email indicating that it would be more tax advantageous to him and Kristin to eliminate Trip as an equity partner in Fire & Ice.

153.   In the June 3, 2007 email, Zach proposed transforming Trip's 40% equity stake in Fire & Ice Imports to merely receiving 40% of gross profits on sales secured by Trip.

154.   On Monday, June 4, 2007, Zach sent Trip an email stating that Zach had mailed Trip a check for $10,000.00 "reimbursing you for seed money and voiding your equity participation in Fire & Ice."

155.   In the June 4, 2007 email, Zach indicated that Trip's compensation had been further reduced to a "40% net profit basis for all sales you make."

156.   In the June 4, 2007 email, Zach also indicated that Trip would be responsible for absorbing all speculative sales costs and all personal expenses past, present and future.

157.   Understandably, Zach's emails completely surprised Trip.   Trip was uncertain how to respond.

158.   On June 6, 2007, because Trip had not responded favorably to Zach's emails of just a few days before, Zach relieved Trip of his duties as "a sales broker for Vellamo and as Vice-President of Sales and Marketing for Fire & Ice Imports."

159.   In the June 6, 2007 email, Zach also informed Trip that Zach had cancelled the $10,000 check that had been sent to reimburse Trip for his equity investment.

160.  In less than three days, the Proctors had purportedly divested Trip of his equity interest in exchange for 40% of gross profits from Trip's sales, then purportedly changed the 40% gross profit to 40% net profit, and, when Trip failed to immediately and without question accept the terms proposed, purportedly terminated his relationship altogether with Fire & Ice.

161.  On or about June 7, 2007, without having any prior relationship with anyone at Ben E. Keith, Zach contacted Ben E. Keith directly and cancelled Trip's appointment without Trip's permission and knowledge for purposes of rescheduling an appointment without him.

162.  Subsequent to the June 7, 2007 phone call from Zach to Ben E. Keith, Ben E. Keith could not meet with Trip on other matters unrelated to Fire & Ice.

163.  Upon information and belief, Zach has communicated false disparaging statements to people at Ben E. Keith, Anheuser-Busch, and other third parties.

### Deceptions Revealed

164.  Without informing Trip, Kristin, upon information and belief, filed documents with the State of California registering Fire & Ice Imports, LLC without identifying Trip as a member in March 2007.

165.  Kristin did so subsequent to the Parties having agreed to share equity interest in Fire & Ice.

166.  Trip learned of the Proctors' deceptive registrations with the State of California subsequent to June 7, 2007.

**Damages to Plaintiffs**

167.   The Plaintiffs have suffered damages in the lost value of consulting time expended on behalf of Elite Water.

168.   The Plaintiffs have suffered damages in the lost value of consulting time expended on behalf of Fire & Ice.

169.   The Plaintiffs have suffered damages in incurring expenses on behalf of Elite Water that have not been reimbursed.

170.   The Plaintiffs have suffered damages in having not been paid a 40% net profit commission for Finnish Nord Ice Age water sales in the amount of $12,426.11.

171.   The Plaintiffs have suffered damages in having not been paid a 5% broker commission for Elite Water's Vellamo sales in the amount of $58,380.00.

172.   The Plaintiffs have suffered damages in incurring expenses on behalf of Fire & Ice that have not been reimbursed in the amount of $8,398.38.

173.   Trip has been purportedly divested of the equity value and future potential equity value he held in Fire & Ice.

174.   The Proctors made promises and representations to Trip knowing them to be empty and false.

175.   Based on the promises and representations made to him, Trip provided the Proctors, Fire & Ice, and Elite Water his expertise, his contacts, his sales opportunities, his skills and talents, and all he could offer to further the businesses of Fire & Ice and Elite Water.

176.  After the Proctors obtained all of these resources from Trip and solid business deals appeared imminent, they unjustifiably disenfranchised him from the companies altogether.

177.  The Proctors expressly informed Trip that they had unilaterally decided to divest him of any equity interests because it would benefit them personally to do so.  In exchange, he would obtain 40% gross profit – not from Fire & Ice combined sales – but from *his* sales.

178.  When Trip did not respond favorably to this unexpected development, the Proctors – within hours – revised their offer to provide Trip 40% of the *net* profits from *his* sales.

179.  When Trip did not respond to this further divestment, the Proctors informed him – within a very short amount of time - that they considered him to be an employee and fired him.

180.  Effectively, in hindsight, the Proctors implemented the very business method that Zach had so emphatically disparaged and – apparently - knew all too well: where agents and producers would make promises to an individual, use the individual's talents to obtain deals, and, just as the deals come to fruition, cut the individual out of the deals.

### CLAIMS FOR RELIEF

### Count I
### By Plaintiffs Against the Proctors and Elite Water
### for Breach of Contract

181.  Plaintiffs adopt by reference the allegations in paragraphs 1 through 180.

182.  Plaintiffs entered into the MCP contract with Elite Water.

183. Plaintiffs performed all of their obligations under the MCP contract with Elite Water.

184. Plaintiffs performed services under the MCP contract with Elite Water subsequent to October 18, 2007.

185. Elite Water has refused to compensate Plaintiffs for the services performed under the MCP contract subsequent to October 18, 2007.

186. Elite Water has breached the MCP contract.

187. Elite Water's breach of the MCP contract has caused Plaintiffs to suffer damages.

188. Plaintiffs have suffered damages as a result of Elite Water's breach of the MCP contract including, but not limited to, the lost value of consulting time expended on behalf of Elite Water, lost profits, and unreimbursed expenses.

189. Plaintiffs have suffered damages as a result of Elite Water's breach of the MCP contract including, but not limited to, in having not received the 5% commission on sales of Vellamo.

190. The Proctors are owners and shareholders of Elite Water.

191. The Proctors have acted in their own self-interest in breaching the MCP contract with Plaintiffs.

WHEREFORE, Plaintiffs pray as follows:

A.  That the Court award them compensatory damages against the Proctors and Elite Water, jointly and severally, for breach of contract in an amount to be determined at trial, together with interest and costs of suit; and,

B.  That the Court award such other relief as justice may require.

## Count II
### By Trip Against the Proctors and Fire & Ice
### for Breach of Contract

192.  Trip adopts by reference the allegations in paragraphs 1 through 180.

193.  The Proctors presented Trip with an offer to form an LLC under the name of Fire & Ice Imports, LLC.

194.  Trip accepted the offer and executed the LLC Agreement sent to him by the Proctors.

195.  Apart from the original capital investment in the LLC Agreement that the Parties agreed to modify, Trip performed all of his obligations under the LLC Agreement.

196.  The Proctors have breached the LLC Agreement by divesting Trip of his equity interest in the LLC.

197.  The Proctors' breach of the LLC Agreement has caused Trip to suffer damages.

198.  Trip has suffered damages as a result of the Proctors' breach of the LLC Agreement including, but not limited to, the loss of his equity interest in Fire & Ice.

199.  Trip has suffered damages as a result of the Proctors' breach of the LLC Agreement including, but not limited to, a 40% commission on sales of Finnish Nord water.

200.  The Proctors are owners and shareholders of Fire & Ice.

201.   The Proctors have acted in their own self-interest in breaching the LLC Agreement with Trip.

WHEREFORE, Trip prays as follows:

A.  That the Court award him compensatory damages against the Proctors and Fire & Ice, jointly and severally, for breach of contract in an amount to be determined at trial, together with interest and costs of suit; and,

B.  That the Court award such other relief as justice may require.

### Count III
**By Trip Against Defendants Fire & Ice and the Proctors
for Fraudulent Misrepresentation**

202.  Trip adopts by reference the allegations in paragraphs 1 through 180.

203.   The Proctors, acting on behalf of themselves and Fire & Ice, made representations to Trip that were false.

204.  The Proctors falsely represented to Trip that he would be an equity partner in Fire & Ice.

205.  The Proctors falsely represented to Trip that he would remain an equity partner in exchange for his investment of money, experience, expertise, time, trade insights, and contacts.

206.  The Proctors continued to make these representations over the course of several months.

207.  The Proctors falsely represented to Trip that he would obtain a 40% commission on sales of Finnish Nord water.

-26-

208.  The Proctors made these representations knowing them to be false.

209.  Alternatively, the Proctors made these representations with such reckless indifference to truth as to be equivalent to actual knowledge.

210.  The Proctors made the false representations for the purposes of defrauding Trip.

211.  Specifically, the Proctors made the false representations so that Trip would provide them with his money, experience, expertise, time, trade insights, and contacts.

212.  Trip relied upon the representations made by the Proctors.

213.  Trip had a right to rely upon the representations in the full belief of their truth.

214.  Trip would not have provided the Proctors with his money, experience, expertise, time, trade insights, and contacts had the Proctors not made the representations.

215.  Trip has actually suffered damage directly resulting from such fraudulent misrepresentations.

216.  Trip has been divested of any equity interest in Fire & Ice.

217.  Trip invested substantial time and money into Fire & Ice without any economic benefit.

218.  In fact, Trip invested substantial time and money into Fire & Ice to his financial loss.

219.  Trip has received no compensation for providing the Proctors and Fire & Ice with his experience, expertise, time, contacts, and trade insights.

220.  Fire & Ice Imports is responsible for the acts of its employees and officers, including the Proctors, pursuant to the doctrine of *respondeat superior*.

221.  The Proctors acted for their own personal interest in making the fraudulent misrepresentations.

WHEREFORE, Trip prays as follows:

A.  That the Court award him compensatory damages against the Proctors and Fire & Ice, jointly and severally;

B.  That the Court award him punitive damages against the Proctors and Fire & Ice, jointly and severally, in an amount to be determined at trial;

C.  That the Court award him costs of suit, including attorneys' fees; and,

D.  That the Court award such other relief as justice may require.

### Count IV
### By Trip Against Defendants Fire & Ice and the Proctors
### for Negligent Misrepresentation

222.  Trip adopts by reference the allegations in paragraphs 1 through 180.

223.  The Proctors, acting on behalf of themselves and Fire & Ice, made representations to Trip that were false.

224.  The Proctors negligently represented to Trip that he would be an equity partner in Fire & Ice.

225.  The Proctors negligently represented to Trip that he would remain an equity partner in exchange for his investment of money, expertise, time, trade insights, and contacts.

226.  The Proctors falsely represented to Trip that he would obtain a 40% commission on sales of Finnish Nord water.

227.  As a fiduciary with Trip, the Proctors owed Trip a duty of care in making representations regarding their business relationship.

228.  The Proctors continued to make these representations over the course of several months.

229.  These representations were false.

230.  The Proctors negligently made the representations for the purposes of having Trip act upon them.

231.  Specifically, the Proctors negligently made the representations so that Trip would provide them with his money, expertise, time, trade insights, and contacts.

232.  The Proctors knew that Trip would probably rely on the representations.

233.  The Proctors knew that if the representations were false or erroneous, Trip's reliance upon the representations would cause him loss or injury.

234.  Trip justifiably relied upon the representations made by the Proctors.

235.  Trip justifiably acted in reliance upon the representations made by the Proctors and provided them, as well as Fire & Ice Imports, the benefit of his money, experience, time, expertise, trade insights, and contacts.

236.  Trip had a right to rely upon the representations in the full belief of their truth.

237.  Trip would not have provided the Proctors with his money, experience, expertise, time, trade insights, and contacts had the Proctors not made the representations.

238.  Trip has actually suffered damages directly resulting from such negligent misrepresentations.

239.  Trip has been divested of any equity interest in Fire & Ice.

240.  Trip invested substantial time and money into Fire & Ice without any economic benefit.

241.  In fact, Trip invested substantial time and money into Fire & Ice to his financial loss.

242.  Trip has received no compensation for providing the Proctors and Fire & Ice with his experience, time, expertise, contacts, and trade insights.

243.  The damages suffered by Trip have been proximately caused by the Proctors' negligence.

244.  Fire & Ice is responsible for the acts of its employees and officers, including the Proctors, pursuant to the doctrine of *respondeat superior*.

245.  The Proctors acted for their own personal interest in making the negligent misrepresentations.

WHEREFORE, Trip prays as follows:

A.  That the Court award him compensatory damages against the Proctors and Fire & Ice, jointly and severally; and,

B.  That the Court award such other relief as justice may require.

## Count V
### By Plaintiffs Against Elite Water and the Proctors
### for Fraudulent Misrepresentation

246.  Plaintiffs adopt by reference the allegations in paragraphs 1 through 180.

247.  The Proctors, acting on behalf of themselves and Elite Water, made representations to Plaintiffs that were false.

248.  The Proctors falsely represented to Plaintiffs that they would be compensated for consulting work invested on behalf of Elite Water.

249.  The Proctors falsely represented to Plaintiffs that they would receive a 5% commission on sales of Vellamo to UNFI.  This brokerage commission amounts to $2,919.00, excluding interest.

250.  The Proctors continued to make these representations over the course of several months.

251.  The Proctors made these representations knowing them to be false.

252.  Alternatively, the Proctors made these representations with such reckless indifference to truth as to be equivalent to actual knowledge.

253.  The Proctors made the false representations for the purposes of defrauding Plaintiffs.

254.  Specifically, the Proctors made the false representations so that Plaintiffs would provide them with their expertise, time, trade insights, and contacts.

255.  Plaintiffs relied upon the representations made by the Proctors.

256.  Plaintiffs had a right to rely upon the representations in the full belief of their truth.

257.  Plaintiffs would not have provided the Proctors with their expertise, time, trade insights, contacts had the Proctors not made the representations.

258.  Plaintiffs have actually suffered damage directly resulting from such fraudulent misrepresentations.

259.  Plaintiffs have invested substantial time and expenses into Elite Water Imports without any economic benefit.

260.  Since October 18, 2007 and through the end of the MCP contract, Plaintiffs have received no compensation for providing the Proctors and Elite Water with their experience, expertise, time, contacts, and trade insights.

261.  Elite Water is responsible for the acts of its employees and officers, including the Proctors, pursuant to the doctrine of *respondeat superior*.

262.  The Proctors acted for their own personal interest in making the fraudulent misrepresentations.

WHEREFORE, Plaintiffs pray as follows:

A.  That the Court award them compensatory damages against the Proctors and Elite Water, jointly and severally, in an amount to be determined at trial;

B.  That the Court award them punitive damages against the Proctors and Elite Water, jointly and severally, in an amount to be determined at trial;

C.  That the Court award Plaintiffs costs of suit, including attorneys' fees; and,

D.  That the Court award Plaintiffs other relief as justice may require.

### Count VI
### By Trip Against the Proctors and Fire & Ice Imports
### for Unjust Enrichment

263.  Trip adopts by reference the allegations in paragraphs 1 through 180.

264.  By providing the Proctors and Fire & Ice with his money, expertise, knowledge, trade insights, contacts, and time, Trip conferred a benefit upon them.

265.  By providing the Proctors and Fire & Ice with sales of Finnish Nord Water, Trip conferred a benefit upon them.

266.  The Proctors and Fire & Ice appreciate and have knowledge of the benefit they received from Trip.

267.  The Proctors and Fire & Ice accepted and have retained the benefit of Trip's money, expertise, knowledge, trade insights, contacts, and time under such circumstances as to make it inequitable for them to retain the benefit without payment of its value.

268.  The Proctors and Fire & Ice accepted and have retained the benefit of the sales of Finnish Nord water provided to them by Trip.

269.  The Proctors acted in their own self-interest in unjustly retaining the benefits conferred upon them by Trip.

270.  Fire & Ice is responsible for the acts of its employees and officers, including the Proctors, pursuant to the doctrine of *respondeat superior*.

WHEREFORE, Trip prays as follows:

A.  That the Court award him compensatory damages against the Proctors and Fire & Ice, jointly and severally;

B.  That the Court award him punitive damages against the Proctors and Fire & Ice, jointly and severally, in an amount to be determined at trial;

C.  That the Court award him costs of suit, including attorneys' fees; and,

D.  That the Court award such other relief as justice may require.

### Count VII
### By Trip Against All Defendants
### for Breach of Fiduciary Duty of Loyalty

271.  Trip adopts by reference the allegations in paragraphs 1 through 180.

272.  As officers and members of Fire & Ice, the Proctors owed a fiduciary duty to Fire & Ice.

273.  As a fiduciary to Fire & Ice, the Proctors had a duty to act on behalf of Fire & Ice.

274.  By purporting to divest Fire & Ice of Trip and the benefits he brought to Fire & Ice, the Proctors breached their duty to Fire & Ice.

275.  The Proctors' breach of their duty to Fire & Ice has proximately caused Fire & Ice to suffer damages.

WHEREFORE, Trip prays as follows:

A.  That the Court award him compensatory damages against the Proctors and Fire & Ice, jointly and severally;

B.  That the Court award him punitive damages against the Proctors and Fire & Ice, jointly and severally, in an amount to be determined at trial;

C.  That the Court award him costs of suit, including attorneys' fees; and,

D.  That the Court award such other relief as justice may require.

**Count VIII**
**By Trip Against Zach and Kristin Proctor**
**for Breach of Fiduciary Duty**

276.  Trip adopts by reference the allegations in paragraphs 1 through 180.

277.  As business partners with Trip, the Proctors owed a fiduciary duty to Trip.

278.  As a fiduciary to Trip, the Proctors had a duty to act on behalf of Trip.

279.  By purporting to divest him of the equity interest in the Fire & Ice and making false representations to him, the Proctors breached their duty to Trip.

280.  The Proctors' breach of their duty to Trip has proximately caused Trip to suffer damages.

WHEREFORE, Trip prays as follows:

A.  That the Court award him compensatory damages against the Proctors and Fire & Ice Imports, jointly and severally;

B.  That the Court award him punitive damages against the Proctors and Fire & Ice Imports, jointly and severally, in an amount to be determined at trial;

C.  That the Court award him costs of suit, including attorneys' fees; and,

D.  That the Court award such other relief as justice may require.

## Count IX
### By Plaintiffs Against the Proctors and Elite Water
### for Unjust Enrichment

281.  Plaintiffs adopt by reference the allegations in paragraphs 1 through 180.

282.  By providing the Proctors and Elite Water with expertise, knowledge, trade insights, contacts, and time, the Plaintiffs conferred a benefit upon them.

283.  By providing the Proctors and Elite Water with sales of Vellamo, the Plaintiffs conferred a benefit upon them.

284.  The Proctors and Elite Water appreciate and have knowledge of the benefit they received from the Plaintiffs.

285.  The Proctors and Elite Water accepted and have retained the benefit of the Plaintiffs' expertise, knowledge, trade insights, contacts, and time under such circumstances as to make it inequitable for them to retain the benefit without payment of its value.

286.  The Proctors and Elite Water accepted and have retained the benefit of the sales of Vellamo provided to them by Plaintiffs.

287.  The Proctors acted in their own self-interest in unjustly retaining the benefits conferred upon them by the Plaintiffs.

288.  Elite Water is responsible for the acts of its employees and officers, including the Proctors, pursuant to the doctrine of *respondeat superior*.

WHEREFORE, Plaintiffs prays as follows:

A.  That the Court award them compensatory damages against the Proctors and Elite Water, jointly and severally;

B.  That the Court award them punitive damages against the Proctors and Elite Water,

jointly and severally, in an amount to be determined at trial;

C.  That the Court award them costs of suit, including attorneys' fees; and,

D.  That the Court award such other relief as justice may require.

**Count X**
**By Trip Against Zach Proctor, Fire & Ice, and Elite Water**
**for Defamation *Per Se***

289.  Plaintiffs adopt by reference the allegations in paragraphs 1 through 180.

290.  In the Fall of 2007, upon information and belief, Zach informed Yasmin

Samaletdin that he and Fire & Ice would no longer be working with Nordwater.

291.  In September 2007, Yasmin Samaletdin inquired of Zach whether she could

contact Trip regarding possibilities for Nordwater in the United States.

292.  On September 30, 2007, in response to Yasmin Samaletdin's inquiry, Zach

sent an email ("September 30 Email") in which he stated:

> You can contact Trip anytime you like, but he is most definitely NOT a part
> of Fire & Ice in any way, shape or form.  I consider him one of the most
> underhanded, dishonest people I have ever met. He wrote fictitious
> purchase orders for us and he could easily put you in a very bad position. I
> will never talk with him again.
>
> Sorry for the negativity, but that's the truth.

293.  In the September 30 Email, Zach stated that Trip was dishonest.

294.  Trip is not dishonest, and Zach's statement to the contrary is false.

295.  In the September 30 Email, Zach stated that Trip was underhanded.

296.  Trip is not underhanded, and Zach's statement to the contrary is false.

297.  In the September 30 Email, Zach stated that Trip wrote fictitious purchase orders.  In essence, Zach stated that Trip committed fraud and engaged in fraudulent activities.

298.  Trip has did not write fictitious purchase orders, commit fraud, or engage in fraudulent activities.  Zach's statements to the contrary are false.

299.  In the September 30 Email, Zach stated that Trip could harm Yasmin Samaletdin in her business activities.  This statement is also false.

300.  The September 30 Email and the statements contained therein are of and concerning Trip.

301.  The September 30 Email and the statements contained ascribe conduct to Trip that adversely affects his fitness for the proper conduct of his business.

302.  The September 30 Email and the statements contained disparage Trip's business reputation.

303.  The September 30 Email and the statements contained therein are defamatory.

304.  In publishing the September 30 Email and the statements contained, Zach acted with actual malice.

305.  Zach knew the defamatory statements to be false.

306.  Zach made the defamatory statements for purposes of retaliating against Trip for filing this action.

307.  Zach made the defamatory statements for purposes of harming Trip.

308.  Zach made the defamatory statements for purposes of discouraging third parties from engaging in any future business opportunities with Trip.

309.  Zach made the defamatory statements for the purposes of destroying any business opportunities Trip may have with Yasmin Samaletdin and Nordwater.

310.  The defamatory statements were not subject to any privilege.

311.  Upon information and belief, Zach has made other and similar unprivileged, defamatory statements to other third parties in Europe and the United States.

312.  Zach made the defamatory statements in his capacity as an officer of Fire & Ice and Elite Water Company.

313.  Fire & Ice and Elite Water Company are responsible for the acts of their employees and officers, including Zach Proctor, pursuant to the doctrine of *respondeat superior.*

314.  Zach Proctor also acted in his own self-interest in making the defamatory statements.

WHEREFORE, Trip prays as follows:

A.  That the Court award him compensatory damages against Zach Proctor, Fire & Ice, and Elite Water, jointly and severally, in an amount to be determined at trial;

B.  That the Court award him punitive damages against Zach Proctor, Fire & Ice, and Elite Water, jointly and severally, in an amount to be determined at trial; and

C.  That the Court award such other relief as justice may require.

Respectfully submitted,

OPPENHEIMER, FLEISCHER & QUIGGLE, P.C.


By    /s/ Charles H. Fleischer _____
        Charles H. Fleischer, Bar No. 00219

7700 Old Georgetown Road, Suite 800
Bethesda, MD 20814
Tel: (301) 986-4056 / Fax: (301) 951-0555
E-mail: cfleischer@ofqlaw.com

*Attorneys for Plaintiffs*


Charles Lee Mudd Jr.
Mudd Law Offices
3114 West Irving Park Road
Chicago, Illinois  60618
Tel: (773) 588-5410
Cook County Attorney No. 38666
Illinois ARDC: 6257957

*Specially Admitted Attorney for Plaintiffs*


## JURY DEMAND

Plaintiffs demand trial by jury.


        /s/ Charles H. Fleischer _____
        Charles H. Fleischer

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing First Amended Complaint and Jury Demand was served on all other attorneys of record and unrepresented parties this 16th day of October, 2005, by mailing copies of the same, first-class postage prepaid, addressed as follows:

> Fire & Ice Imports, LLC
> Kristin A. Proctor, Resident Agent
> 528 3[rd] Street
> Hermosa Beach, CA 90254
>
> Elite Water Company
> Kristin A. Proctor, Resident Agent
> 528 3[rd] Street
> Hermosa Beach, CA 90254
>
> Zachary Proctor
> 528 3[rd] Street
> Hermosa Beach, CA 90254
>
> Kristin A. Proctor
> 528 3[rd] Street
> Hermosa Beach, CA 90254

/s/ Charles H. Fleischer
Charles H. Fleischer

-41-